### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| In re Rental Systems, L.L.C., Debtor. | Bankruptcy No. 13-B-81734 Chapter 11 Judge Thomas M. Lynch |

### MEMORANDUM OPINION

Before the court is the Debtor's application to employ Neal Wolf & Associates, LLC ("NW&A") as counsel for the Debtor.  For the reasons stated in open court on December 31, 2013, and more fully herein, the application will be denied.

### I.   JURISDICTION

The court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

### II.   PROCEDURAL HISTORY AND FINDINGS OF FACT

The Debtor filed a voluntary petition for protection under chapter 11 of the Bankruptcy Code on May 9, 2013, through its attorney, Neal Wolf and his then-firm, Neal Wolf & Associates.[1]  Mr. Wolf was the manager and sole member of NW&A, which employed six attorneys and three legal assistants. (Supplemental Decl., ECF No. 55.)  Mr. Wolf has over 39 years of experience in the legal practice areas of bankruptcy, insolvency, debtors' and creditors'

---

[1] On February 18, 2014, Mr. Wolf filed a notice that his firm had merged with and into Much Shelist, PC. (ECF No. 129.)

rights, debt restructuring and corporate reorganization, and commercial litigation. (Suppl. Decl., ECF No. 55.)

## A. Summary of Relevant Procedural History

The Application to Employ Neal Wolf & Associates was filed on July 16, 2013 (ECF No. 38), almost ten weeks after the Debtor commenced this chapter 11 case. The U.S. Trustee filed his objection to the application on July 19, 2013. (ECF No. 42.) Creditor PNC Bank, N.A. joined the U.S. Trustee's objection, filing its short response in opposition to the application on July 22, 2013(ECF No. 45.) With leave of court, NW&A filed a supplemental declaration on August 14, 2013 (ECF No. 55) and over the course of the next several weeks the parties filed additional submissions (Debtor's Resp. to Objection, ECF No. 57; U.S. Tr.'s Reply, ECF No. 63; Debtor's Sur-Reply, ECF No. 77). The court permitted discovery after which it held a full-day trial. The Debtor called as its witnesses Neal Wolf and Daniel Shepard, executive vice president of Plote Homes. The objecting parties re-called Mr. Wolf as their sole witness. During the trial, the Debtor's three exhibits and 34 exhibits presented by the objecting parties were received into evidence. On December 31, 2013, the court denied the employment application, giving a brief summary of its ruling on the record, but noting that the decision would be followed by a more detailed written opinion. This is that opinion.

## B. Findings of Facts

### i. Prior and Current Representation of Direct and Indirect Affiliates of the Debtor

The Debtor is a limited liability company owned by the Raymond E. Plote Living Trust, which is its sole member. (Trial Tr. 64:9 – 65:11, Oct. 24, 2013.) Raymond Plote is the manager of the Debtor, as well as the trustee and beneficiary of the Raymond E. Plote Living Trust. (Trial

Tr. 65:24-4, Oct. 24, 2013.) Both before and after the petition date, Neal Wolf and NW&A had represented several individuals and entities affiliated with either the Debtor or Mr. Plote.

### (a) White Deer Run

As early as late fall or early winter of 2012, NW&A began representing White Deer Run Golf Course, LLC ("White Deer"), a municipal golf course 51.0% owned by the Raymond E. Plote Living Trust. The living trusts of Mr. Plote's two sons own 49.0% of White Deer. (Suppl. Decl., ECF No. 55; Trial Tr. 14:1-11, Oct. 24, 2013.) On an unspecified date BMO Harris filed a foreclosure action against White Deer in Lake County, Illinois, Case No. 12 CH 5598, to foreclose on a leasehold interest in the golf course.[2] Raymond Plote is named as a codefendant in the action as a guarantor of the debt to BMO Harris Bank. White Deer and Mr. Plote were primarily represented by an unaffiliated attorney named Warren Fuller in the foreclosure action, but NW&A filed its additional appearance on behalf of the defendants in the foreclosure action on January 14, 2013 while Mr. Fuller reportedly was in Florida. (Suppl. Decl., ECF No. 55; Trial Tr. 14:14 – 15:11, Oct. 24, 2013.) Mr. Wolf asserted that he filed the appearance only to receive notices and monitor the foreclosure action. (Suppl. Decl., ECF No. 55, ¶14.) Mr. Wolf further claimed that neither he nor NW&A prepared or filed any pleadings in that case. (Suppl. Decl., ECF No. 55, ¶14.)

NW&A continued to appear on file as an attorney of record in the foreclosure proceeding post-petition, even as of July 2013 when NW&A filed its employment application.

---

[2] Mr. Wolf's Supplemental Declaration states that BMO Harris sought to foreclose on a mortgage "covering the Debtor's leasehold interest" in the golf course known as White Deer Run but then states that the Debtor was not a party to the suit and that the suit was "wholly unrelated to" this bankruptcy case. (Suppl. Decl., ECF No. 55, ¶13.) The Debtor's schedules did not list any leases or other interests in any golf courses, and the court concludes that this statement was a clerical error intending to refer to *White Deer's* leasehold interest. While BMO Harris is listed as a creditor in Debtor's Schedule F, that claim appears to be unrelated to White Deer, as it is not marked as having any co-debtors and White Deer is not listed as a co-debtor in Schedule H.

However, Mr. Wolf alleges that on August 9, 2013, the Lake County court granted leave to withdraw as counsel in the foreclosure action. (Suppl. Decl., ECF No. 55, ¶¶15, 23.a.)[3]  Although the Supplemental Declaration stated that "NW&A terminated its representation of [White Deer and the foreclosure co-defendants] on August 9, 2013" (Supp. Decl., ECF No. 55, ¶23.a), Mr. Wolf testified at trial on October 24, 2013, that he "frankly, still continue[s] to make some efforts … to restructure [the indebtedness with BMO Harris] on behalf of White Deer Run" (Trial Tr. 14:14-22, Oct. 24, 2013).   The evidence therefore shows that while NW&A might no longer be named counsel of record in the foreclosure action, that firm continued to represent and treat White Deer as the firm's client well after the commencement of this chapter 11 case, even as of the date of the hearing on the Debtor's application to employ the firm.

### (b) Boulder Ridge

Boulder Ridge Country Club ("Boulder Ridge") is owned entirely by the Raymond Plote Living Trust. (U.S. Tr.'s Ex.1.)[4]  Sometime between December 2012 and early February 2013 Boulder Ridge asked NW&A to advise it in connection with a forbearance agreement between Boulder Ridge and BMO Harris Bank. (Trial Tr. 17:18 – 19:2.)   The forbearance agreement relates to a debt for which both the Debtor and Raymond Plote are jointly liable.   Mr. Wolf testified that the amount of the debt at issue is between $1.3 and $1.4 million. (Trial Tr. 18:16-18, Oct. 24, 2013.)  However, the Debtor's schedules and the testimony of the Daniel Shepard, executive vice president of Plote Homes, indicate the amount to be was approximately $3.4 million. (U.S. Tr.'s Ex. 18, Schedule H; Trial Tr. 81:12 – 82:9, Oct. 24, 2013.)

---

[3] The Supplemental Declaration at one point states that NW&A was granted leave to withdraw on August 9, 2012 (ECF No. 55, ¶55), but this, too, appears to be a clerical mistake.

[4] There was some confusion in the record as to whether Boulder Ridge is a limited liability company or a corporation.  However, the record is clear that all parties are referring to the same entity.

Mr. Wolf characterized his representation of Boulder Ridge as limited, involving only four or five hours of his time. (Trial Tr. 19:1-2, Oct. 24, 2013.) He believed NW&A last sent its bill to Boulder Ridge in March 2013. (Trial Tr. 19:15-20, Oct. 24, 2013.) NW&A did not submit collaborating evidence to support its anecdotal account that NW&A had terminated its representation of Boulder Ridge and that Boulder Ridge is so aware.

### (c) Metro Commons

Metro Commons, LLC is 75% owned by the Raymond Plote Living Trust, 6.0% by the Janice Plote Living Trust, and 19% by living trusts of his two sons. Metro Commons Hospitality, LLC is 85% owned by Metro Commons, LLC and 15% by another limited liability company. (U.S. Tr.'s Ex. 1.) Mr. Wolf admitted that he and NW&A currently represent Metro Commons, LLC and Metro Commons Hospitality, LLC, and have done so since the fall or winter of 2012. (Trial Tr. 20:16 – 21:22, Oct. 24, 2013.) NW&A represents these entities in ongoing negotiations regarding a possible restructuring of their indebtedness to U.S. Bank, First Midwest Bank and another lender. (Trial Tr. 21:1-22, Oct. 24, 2013.) Mr. Wolf alleges that NW&A does not represent the interests of Mr. Plote or the other individuals in connection with NW&A's work regarding "Metro Commons" debt and that the debt is unrelated to the Debtor's bankruptcy case. (Suppl. Decl., ECF No. 55, ¶23.b.)

### (d) PNC Debt

On or about January 3, 2013, PNC Bank, NA ("PNC"), as successor to MidAmerica Bank, FSB, filed a complaint in the Northern District of Illinois against the Debtor, Raymond Plote, the Raymond E. Plote Living Trust, Janice Plote and the Janice Plote Living Trust (the "Plote Guarantors"). PNC sought to enforce a promissory note which PNC claimed to have a balance

of $9,876,182.06 as of the date of its district court complaint. PNC alleges that the Plote

Guarantors are liable for this note which matured on January 17, 2012. (U.S. Tr.'s Ex. 9.)[5]

Mr. Wolf testified that he met with Raymond Plote and certain representatives of the

Debtor regarding the PNC indebtedness in December 2012 or January 2013.   He agreed to

represent the Plote Guarantors as well as the Debtor in connection with the potential

restructuring of the PNC indebtedness.  Mr. Wolf admitted that about that time he became

aware of the district court lawsuit. (Trial Tr. 9:11 – 10:9, Oct. 24, 2013.)  On March 1, 2013, Mr.

Wolf filed his appearance in the PNC Litigation on behalf of both the Debtor and the Plote

Guarantors.   Mr. Wolf testified that he only agreed to enter his appearance because the

Debtor's and Plote Guarantors' main attorney, Warren Fuller, was "traveling a lot" and had to

have surgery. (Trial Tr. 10:10-21, Oct. 24, 2013.)  In the PNC Litigation NW&A prepared and filed

a joint status report, sought an extension of the deadline for answering, and appeared in court

for the initial status hearing. (Suppl. Decl., ECF No. 55, ¶18.)

Around April 6, 2013, Mr. Wolf and Raymond Plote, on behalf of the Debtor, signed an

engagement letter for NW&A to represent the Debtor in a potential bankruptcy case. (U.S. Tr.'s

Ex. 11.)  Less than a week later, on April 8, NW&A filed an answer on behalf of both the Debtor

and the Plote Guarantors. (U.S. Tr.'s Ex. 12.)   NW&A continued to represent the Plote

Guarantors in the PNC Litigation for several more weeks post-petition.  Mr. Wolf testified that

in a conversation with a representative of the U.S. Trustee's office shortly after the petition

date he was informed that "as a condition of [NW&A's] representation of the debtor in [the

bankruptcy] case the U.S. Trustee would like [NW&A] to withdraw as counsel" in the PNC

---

[5] Debtor's Schedule F to the bankruptcy petition, filed June 6, 2013, lists an unsecured debt to PNC of $8,950,000, which was marked as disputed and unliquidated. Schedule H lists the Plote Guarantors as co-debtors on that debt.

Litigation. (Trial Tr. 11:7 – 12:2, Oct. 24, 2013.)  On June 18, 2013, NW&A filed a motion in the

PNC Litigation for substitution of counsel. The district court granted that motion on June 25.

(Suppl. Decl., ECF No. 55, ¶20.)   Mr. Wolf alleges that Attorney Fuller, not NW&A, now

represents the Plote Guarantors in the PNC Litigation. (Suppl. Decl., ECF No. 55, ¶20.)

On July 3, 2013, Mr. Wolf, purportedly on behalf of the Debtor, filed an adversary

proceeding in this case that sought to enjoin the PNC Litigation against the Plote Guarantors.

ii.    **Nature of the Debtor's Business, Pre-petition Transfers, and Source of Retainer**

The Debtor admits that it has almost no business operations and that it generates

almost no income.  The Debtor's Amended Statement of Financial Affairs discloses that its only

income for 2011 and 2012 was approximately $1,725 per year in "farm rents." (Amended SOFA,

¶¶1, 2.) Presumably this income is from the Debtor's minority interests in two land trusts listed

in its Amended Schedule B.   The Debtor's remaining primary scheduled assets consist of

membership interests in two limited liability companies and a parcel of undeveloped real estate

in Indiana scheduled as worth $500,000. (U.S. Tr.'s Ex. 18, Schedule A, B.)   The real estate

apparently consists of a gravel mining pit.  The Debtor's schedules do not attribute any income

to that property.  Indeed, Daniel Shepard of Plote Homes testified that the Debtor does not

receive regular cash flows from the mining pit or the two limited liability companies. (Trial Tr.

56:22 – 57:5, Oct. 24, 2013.)  As of the petition date, the Debtor had no employees and no

regular operations. (Trial Tr. 67:13-14, Oct. 24, 2013.)

Prior to April 2013, the Debtor served as the "cash management system" for various

Plote-affiliated entities on the "real estate development" side of the conglomerate of Plote-

affiliated businesses.  As described by Mr. Shepard, who put the system into place, until the

petition date the Debtor was "the entity that [was] actually controlling the centralized cash flow management system." (Trial Tr. 41:20-24, Oct. 24, 2013.)   In such capacity, the Debtor "control[led] any surplus funds from companies, pa[id] bills … [b]asically control[led] all cash [and] control[led] the intercompany balances that exist[ed] from the development of surplus cash that may come from" the 30 or so affiliated entities on the real estate side of the business and "loan[ed] funds to other entities that may need cash." (Trial Tr. 40:20 – 41:4, Oct. 24, 2013.)   Additionally, rather than the 30 affiliated entities having their own bank accounts, the Debtor maintained a centralized account or accounts in its own name. (Trial Tr. 42:2-16, Oct. 24, 2013.)   Aware that it would shortly commence this bankruptcy case, the Debtor transferred $935,000 in cash from the Debtor's accounts to Plote Property Management, LLC between April 8 and April 9, 2013. (Amend. SOFA ¶10.)   According to Mr. Shepard, this was done to "remove it from the bankruptcy filing" and to "make, hopefully, our life easier" (Trial Tr. 52:17-22, Oct. 24, 2013), and to transfer the cash management function to Plote Property Management. (Trial Tr. 67:21 – 68:1, Oct. 24, 2013.)

As of April 30, 2013, the Debtor's records showed that it owed the Plotes and Plote Affiliates a total of $58,154,883.30 and was owed a total of $51,959,250.26 from the Plotes and Plote Affilates as well as $1,680,037.41 from a certain "Kurt Kresemery." (Debtor's Ex. B.)   The Debtor alleges that the amounts owed it from affiliates are not actual assets of the estate, but only paper entries made pursuant to its cash management system role.   The Debtor treats the net sum of -$4,515,595.63 as a liability to "affiliates" in its Schedule F.   It does not list the receivables owed from affiliates as an asset in its Schedule B.   The Debtor does provide a brief explanation for this fact as Exhibits A and D to its bankruptcy schedules.

The schedule of intercompany liabilities submitted by the Debtor at trial to support its argument that such liabilities are not true assets or liabilities list two discrete groups of entities to whom the Debtor owes money and who owe the Debtor money, with no overlap between the two groups. Therefore, this is not a matter of simple setoff rights. While NW&A argued that the Debtor had been a mere intermediary for loans from "owing to" affiliates to "owed from" affiliates,[6] he did not provide credible evidence to show that any particular "paper asset" is traceable to any other particular "paper debt," or to demonstrate that the Debtor was segregating any particular funds for any particular purpose.

Among the entities and individuals that NW&A had represented, the Debtor's records disclose that as of April 30, 2013, the Debtor was owed $94,303.27 from Metro Commons, LLC, $3,230,436.31 from White Deer Run LLC, $1,783,682.51 from Raymond Plote, and $1,162,725.40 from Janice Plote; and that the Debtor owed Boulder Ridge Country Club LLC $144,478.70. (Debtor's Ex. B.)

Additionally, the Debtor's records show that it owed $45,275,581.51 to Plote Construction, Inc. and $1,689,466.83 to Plote Property Management LLC. (Debtor's Ex. B.) Mr. Wolf contends that these are not true debts of the Debtor, but merely book entries for the cash management system. (Trial Tr. 125:25 – 126:5, Oct. 24, 2013) (testifying that, "Yes, Rental

---

[6] For example, Mr. Wolf testified that, "I have told you that the due-from and due-to do not represent – at least on the asset sides they don't represent assets of this debtor." (Trial Tr. 125:17-19, Oct. 24, 2013). See also, e.g., Mot. to Employ NW&A, July 16, 2013, ECF No. 38, ¶19 (noting that while Debtor's books and records show amounts owing to or from Metro Commons, L.L.C., Boulder Ridge and White Deer, those amounts are "payable by" or "payable to and for the benefit of the other Plote Business Entities"); Bankruptcy Schedules, June 7, 2013, ECF No. 18, Ex. A, D (stating that scheduled "receivables represent amounts due and owing by various Plote Business Entities and Plote Owners to other Plote Business Entities and third-party creditors and are recorded on Rental Systems' books solely for administrative purposes" and that "[n]otwithstanding the fact that [certain] inter-company loans were reflected on the books and records of Rental Systems, they were, in fact, loans made to and from other Plote Business Entities, and reflected as appropriate debits or credits on their respective accounts").

Systems was the name on the bank account and Rental Systems both received the revenues of other entities and issued checks on behalf of other entities, but that does not mean that the due-to and due-from are due-tos and due-froms with respect to Rental Systems.")  Plote Construction, Inc., however, filed a proof of claim on August 2, 2013, for an unsecured claim $42,769,838.78 against the Debtor's estate.  The Plote Construction claim describes the bulk of the liability to be "Loans to Rental Systems, L.L.C." (Claims Register, Claim 2-1.)  That proof of claim does not assert any security interest or setoff right.

Prior to the petition date, NW&A received a total of $142,621.10 in connection with the anticipated bankruptcy filing.  On February 6, 2013, the Debtor paid NW&A $32,621.10 for services invoiced.  On April 5, 2013, Plote Construction, Inc. paid NW&A a $60,000 retainer for services to be provided to the Debtor in this bankruptcy case.  Plote Construction paid NW&A an additional $50,000 retainer for these services on May 3, 2013. (Suppl. Decl.¶9.)  As noted above, Plote Property Management LLC received $935,000 in cash from the Debtor's account between April 8 and April 9, 2013, and became the new 'cash management system' for the conglomerate of real estate development entities in place of the Debtor around that time. (Amend. SOFA ¶10.)

The unapplied portion of the $110,000 retainer remaining in NW&A's IOLTA trust account was $11,315.82 as of August 14, 2013. (Suppl. Decl. ¶10.)  Mr. Wolf testified that he did not originally know that the source of the retainers was Plote Construction, Inc. rather than the Debtor, and that NW&A did not have any agreement with Plote Construction, Inc. regarding these retainers. (Trial Tr. 30:10 – 31:4, Oct. 24, 2013.)

### iii.   Failure to Timely Disclose or File Employment Application

Attorney Neal Wolf filed the petition on behalf of Rental Systems, LLC on May 9, 2013. Raymond Plote signed the petition on the Debtor's behalf as its manager and as trustee of the limited liability company's sole member. This initial petition was a so-called 'skeletal petition' filed without schedules, and did not include a disclosure of compensation by Neal Wolf or NW&A. On May 22, 2013, Mr. Wolf filed a motion to extend the time to file certain schedules and statements under Bankruptcy Rule 1007 through June 7, 2013. That motion, and the argument made to the court while presenting the motion, made no reference to the deadlines to file disclosures or motions relating to the employment or compensation of NW&A, Bankruptcy Rule 2014, or a request to extend the related deadline.

NW&A filed bankruptcy schedules and a statement of financial affairs on June 7, 2013. These filings also did not include a formal disclosure of compensation or a copy of the retention agreement with NW&A. The Statement of Financial Affairs did disclose, in answer to question 9, that NW&A had received $32,621.10 on February 7, 2013 for "legal work, some of which was on behalf of the debtor," $60,000 on April 5, 2013 for "retainer for bankruptcy preparation and case" and $50,000 on May 3, 2013 for "additional retainer for bankruptcy preparation and case." (SOFA, ECF No. 19, ¶9.) The Debtor's response to this question did not disclose that any of these payments were received from a party other than the Debtor. Rather, in each case the Debtor left blank the column labeled "NAME OF PAYER IF OTHER THAN DEBTOR." Id. The Section 341 Meeting of Creditors was held on June 14, 2013. On July 3, 2013, NW&A filed an Amended Statement of Financial Affairs on behalf of the Debtor with no change to question 9.

On July 3, 2013, NW&A filed an adversary proceeding, purportedly on behalf of the Debtor, seeking "entry of a preliminary injunction enjoining PNC [Bank] from continuing to prosecute the [PNC Litigation] against the [Plote] Guarantors during the pendency of [the Debtor's] chapter 11 case." (Compl., ECF No. 32, ¶1.)  On July 12, 2013, the U.S. Trustee filed a motion to dismiss or convert the bankruptcy case, noting in part that NW&A had represented the Plote Guarantors in the PNC Litigation at least between April 8, 2013, and June 25, 2013, and that NW&A had filed the Debtor's adversary proceeding to enjoin that same litigation. The U.S. Trustee noted in that motion that the Debtor in Possession had not yet filed an application to employ NW&A as counsel for the Debtor in Possession. (Mot. to Convert or Dismiss, ECF No. 32, ¶¶5 – 9.)

On July 13, 2013, NW&A filed a proposed chapter 11 plan of reorganization (the "Plan") on behalf of the Debtor.  The Plan seeks to repay PNC's and BMO Harris Bank's claims through monthly payments of interest only at 4.875% *p.a.* for 83 months with a balloon payment of the full principal in the 84th month.  The proposed Plan further provides for the dismissal of the PNC Litigation with prejudice.  The Plote Guarantors' guaranty, however, will be reinstated with respect to the Debtor's obligations to PNC under the Plan.  The Plan also provides that certain parcels of real estate owned by affiliates of the Debtor or the Plotes, which the Debtor believes are worth approximately $5 million, will be pledged to PNC as additional collateral to secure the Debtor's obligations to PNC under the Plan.  Finally, the July 2013 Plan proposes that the reorganized debtor will continue to be owned by the Debtor's 100% equity holder and managed by its same manager, and that the Debtor will make "all payments and distributions [] under the Plan from its ordinary course business operations." (Plan, ECF No. 35, Section VI.C.)

The uncontroverted testimony presented to the court during the hearing on this motion, however, reveals that the Debtor has no 'ordinary course business operations' from which to make those payments.  As noted above, Mr. Shepard testified that the Debtor has no employees, no longer acts as the cash management system for the conglomerate of Plote affiliated entities, and that Debtor's only current source of income is $1,725 in annual rents.  The Debtor has not shown that it intends to engage in any new form of business or liquidate any assets.  Its Plan provides for a pledge of certain real estate collateral by affiliates to a single creditor, but the Debtor does not indicate whether the property will be transferred to the Debtor or liquidated to fund the Plan.  In his closing statement at trial, attorney Wolf, without having offered evidentiary support, alleged that the Plotes and their affiliates had funded over $600,000 in interest payments directly or through the Debtor to PNC of during 2012, and further suggested that Plan payments will be funded in a similar manner post-confirmation.  (Trial Tr. 136:2-24, Oct. 24, 2013.)  But, the Debtor offered no suggestion, much less evidence, that demonstrates that its affiliates are obligated to and in fact will make such suggested payments and contributions – none of which are mentioned in its proposed Plan – in the future.

Debtor finally filed its application to employ NW&A as counsel pursuant to Section 327(a) on July 16, 2013.  The application disclosed the $32,621.10, $60,000 and $50,000 payments received by NW&A, but not the source of those payments.  It further disclosed that NW&A holds $11,315.82 in its IOLTA trust account, which is described as the remaining balance of the retainers.  A copy of an engagement letter dated April 5, 2013 between the Debtor and NW&A is attached to the July 16 application.

Also attached is the signed declaration by Attorney Wolf, in which he discloses NW&A's

Rule 2014(a) "connections" as follows:

a. During the late fall/early winter of 2012, I was contacted by Daniel Shepard, Executive Vice President of Plote Homes, LLC, who scheduled a meeting with me to discuss a potential restructuring of various real estate loan maturities, including a debt held by PNC Bank, N.A. ("PNC"), a creditor in this Case.

b. The PNC debt arises from a certain loan dated December 20, 2006 from MidAmerica Bank, FSB, the original lender, to the Debtor in the original principal amount of $9,200,000. Raymond E. Plote, Janice Plote, The Raymond E. Plote Living Trust dated 7/16/83 and The Janice Plate Living Trust dated 7/16/83 are guarantors to the PNC loan (collectively, the "Guarantors"). Raymond E. Plote is the sole manager of the Debtor and the Raymond E. Plate Living Trust dated 7/16/83 is the sole member of the Debtor.

c. At that time, the Debtor, the Guarantors and I were hopeful that a settlement with PNC could be achieved and that the commencement of a bankruptcy could be averted.

d. After out-of-court restructure negotiations failed, on January 3, 2013, PNC filed a lawsuit against the Debtor and the Guarantors in the United States District Court for the Northern District of Illinois (Eastern Division), Case No. 13-cv-00041 (the "PNC Lawsuit").

e. On March 1, 2013, my associate John A. Benson, Jr. and I each filed an appearance in the PNC Lawsuit on behalf of the Debtor and the Guarantors.

f. While acting as counsel for the Debtor and the Guarantors in the PNC Lawsuit, NW&A prepared and filed a joint status report, sought an extension of the deadline for answering or otherwise pleading to the complaint, appeared in court for the initial status hearing, and filed an answer and affirmative defenses.

g. On June 13, 2013, I spoke with Mr. Thomas Walz, counsel for the United States Trustee, regarding NW&A's representation of the Guarantors in the PNC Lawsuit. After further discussions with counsel for the United States Trustee at the Debtor's June 14, 2013 meeting of creditors, I agreed that NW&A would no longer represent the Guarantors in the PNC Lawsuit and would immediately seek leave of court to withdraw as or substitute counsel for the Guarantors.

h. On June 18, 2013, my firm filed a motion to substitute counsel, which motion was presented to and granted by the Court on June 25, 2013. As a result, NW&A no longer represents the Guarantors in the PNC Lawsuit.

i. As of the Petition Date, the Guarantors are not creditors of the Debtor and do not owe money to the Debtor. In addition, the Debtor is not aware of

any indemnification or contribution claims by and between the Debtor and the Guarantors relating to the PNC debt.

(Mot. to Employ NW&A, ECF No. 38, Ex. A, ¶17.)  This declaration further states that:

a. NW&A is currently acting as co-counsel for defendants White Deer Run Golf Course, L.L.C., Par Development, Inc., affiliates of the Debtor, and Raymond E. Plote, the manager and trustee of the sole member of the Debtor, in a certain foreclosure action pending before the Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois captioned *BMO Harris Bank, N.A. v. White Deer Run Golf Course, LLC*, et al., Case No. 12 CH 5598. White Deer Run Golf Course, L.L.C., Par Development, Inc., and Raymond E. Plote are not creditors of the Debtor and do not owe money to the Debtor. As of the Petition Date, the Debtor's books and records reflect an amount due from White Deer Run Golf Course, L.L.C. of $3,230,436.31 and an amount due from Raymond E. Plote of $1,783,682.51, but payable to and for the benefit of the other Plote Business Entities.

b. NW&A currently represents Metro Commons, L.L.C. and Metro Commons Hospitality, L.L.C., affiliates of the Debtor, in certain out of court restructuring negotiations with US Bank and certain other participant lenders. Metro Commons, L.L.C. and Metro Commons Hospitality, L.L.C. are not creditors of the Debtor. As of the Petition Date, the Debtor's books and records reflect an amount due from Metro Commons, L.L.C. of $94,303.27, but payable to and for the benefit of the other Plate Business Entities.

c. Prior to the commencement of the Case, NW&A represented Boulder Ridge Country Club, Inc., an affiliate of the Debtor and a co-debtor, in certain out of court restructuring negotiation with Harris Bank, N.A. As of the Petition Date, the Debtor's books and records reflect an amount due to Boulder Ridge Country Club, Inc. of $144,478.70, but payable by the other Plote Business Entities in the ordinary course of business.

(Mot. to Employ NW&A, ECF No. 38, Ex. A, ¶18.)  Finally, the declaration describes the Debtor's prior role in the cash management system for the various Plote entities, stating that:

From time to time, various Plote Business Entities loaned money through the Debtor to and for the benefit of other Plote Business Entities and Plote Owners. Notwithstanding the fact such inter-company loans were reflected on the Debtor's books and record, they were, in fact, loans made to and from other Plote Business Entities, and reflected as appropriate debits or credits on their respective accounts. As of the Petition Date, the Debtor's books and records reflect a net payable and amount due and owing to the Plote Business Entities of $4,515,595.63; however, any such amount shall be paid by one or more other Plote Business Entities.

(Mot. to Employ NW&A, ECF No. 38, Ex. A, ¶18.)   Attorney Wolf concludes by affirming that "pursuant to Bankruptcy Rule 2014(a), I reviewed NW&A's records, and to the best of my knowledge, have determined that neither I nor NW&A have any connections to the Debtor's officers and directors, creditors, any other parties in interest, the United States Trustee, or any person employed in the office of the United States Trustee." (Mot. to Employ NW&A, ECF No. 38, Ex. A, ¶20.)

On July 19, 2013, the U.S. Trustee filed its objection to the application to employ, alleging that NW&A was not disinterested, had not fully disclosed information or complied with Bankruptcy Rules 2014 or 2016, and had not demonstrated that the firm was entitled to retroactive relief. (ECF No. 42.) On July 22, 2013, PNC adopted and joined in the U.S. Trustee's objection. (ECF No. 45.)

Mr. Wolf filed a "Supplemental Declaration" on August 14, 2013. (ECF No. 55.)   His Supplemental Declaration discloses the source of payment of the two retainers as being from Plote Construction, Inc.   It also provides some additional information about NW&A's representation of affiliated entities, namely explaining why Mr. Wolf believes that the White Deer litigation and NW&A's representation of Metro Commons, LLC and Boulder Ridge are unrelated to the Debtor's bankruptcy case because they relate to loans secured by non-Debtor collateral.   He further declares that he had entered an appearance on behalf of Mr. Plote, White Deer and another affiliate in the White Deer litigation on January 14, 2013, but that, subsequent to the initial disclosure NW&A "terminated its representation of the [White Deer] Defendants on August 9, 2013." (Suppl. Decl., ECF No. 55, ¶¶14, 15, 23.a.). Finally, apparently in order to track the language required by Rule 2014(a), he declares that, in addition to the

persons listed in paragraph 20 of his original declaration, he has also determined that neither

he nor NW&A have any connections to "the Debtor's attorneys [or] accountants." (Suppl. Decl.,

ECF No. 55, ¶26.)

On September 5, 2013, for the first time in the case, NW&A filed a formal Form 203

Disclosure of Compensation of Attorney for Debtor. (Disclosure, ECF No. 74.) It states, among

other things, that NW&A had agreed to accept $131,305.28 for legal services, had received

$142,621.10 prior to the date of filing the statement, that the source of the compensation was

"Plote Construction, Inc. advanced funds on behalf of the debtor" and that the "Debtor may

seek advances from certain Affiliates in accordance with pre-petition practices" to pay future

compensation. Id.


### III.     ANALYSIS

#### A.  Disclosure Requirements

Section 327(a) permits a chapter 11 debtor in possession to retain only attorneys "that

do not hold or represent an interest adverse to the estate, and that are disinterested persons."

In re Knight-Celotex, LLC, 695 F.3d 714, 722 (7th Cir. 2012).  Bankruptcy Rule 2014(a) "facilitates

enforcement of section 327(a) by requiring that professionals seeking to represent the trustee

in a bankruptcy proceeding submit a verification that fully and broadly discloses 'the person's

connections with the debtor, creditors, [or] any other party in interest,' among others."  In re

Knight-Celotex, LLC, 695 F.3d 714, 722 (7th Cir. 2012) (quoting Fed. R. Bankr. P. 2014(a)).  These

disclosure requirements "apply to all professionals and are not discretionary." U.S. v. Gellene,

182 F.3d 578, 588 (7th Cir. 1999). Specifically, Rule 2014(a) requires that any application for employment under Section 327:

> shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed <u>setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.</u>

Fed. R. Bankr. P. 2014(a) (emphasis added).

The "connections" that must be disclosed are "'considerably broader' than the disclosures required for section 327(a)." 695 F.3d at 722 (citing <u>In re Gluth Bros. Constr., Inc.,</u> 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011)). "Bankruptcy courts have neither the resources nor the time to investigate the veracity of the information submitted in 2016(b) statements and affidavits and to root out the existence of undisclosed conflicts of interest." <u>Crivello</u>, 134 F.3d at 839.

Although neither Section 327 nor Rule 2014 explicitly state that court approval must be obtained before an attorney provides services, the Seventh Circuit has "recognized that prior approval is strongly preferred and has been required as a matter of sound judicial administration." <u>In re Cashen</u>, No. 01-1769, 56 Fed. Appx. 714 (7th Cir. Dec. 12, 2002) (quotation marks omitted); <u>In re Singson</u>, 41 F.3d 316, 319 (7th Cir.1994). If parties fail to obtain prior approval, "the court can grant retroactive approval if the parties demonstrate 'excusable neglect.'" <u>Id.</u>

Counsel who "fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." In re Am. Intern. Refinery, Inc., 676 F.3d 455, 465-66 (5th Cir. 2012). This is especially the case if the failure to disclose is intentional, since "a bankruptcy court should punish a willful failure to disclose the connections required by Fed.R.Bankr.P. 2014 as severely as an attempt to put forth a fraud upon the court." Crivello, 134 F.3d at 839. Ultimately, the bankruptcy court must "gauge the ongoing interplay of factors and … make the delicate judgment calls which such a decision entails." 134 F.3d at 839.

The Bankruptcy Rules also require attorneys representing the debtor in connection with a bankruptcy case to file a disclosure of compensation given or promised and the source of such compensation. "Courts have a need and a right to full, unfettered disclosure of all fee and financial arrangements between debtors and their attorneys." In re Pawlak, 483 B.R. 169, 178 (Bankr. W.D. Wisc. 2012) (quotation marks omitted). Such disclosure requirements are essential to enable the court to meaningfully examine and regulate fees under Sections 329, 330 and 331, and reflects "a congressional concern that there might be the 'potential for overreaching' by debtors' counsel." Pawlak, 483 B.R. at 178 (quoting In re Nelson, 424 B.R. 361, 364 (Bankr. N.D. Ill.2009)). See also Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis), 113 F.3d 1040, 1045 (9th Cir.1997) (The Bankruptcy Code contains a number of provisions "designed to protect the debtor from the debtor's attorney").

Rule 2016(b) provides that:

>   Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has

shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

The Bankruptcy Rules require use of official forms when applicable. Fed. R. Bankr. P. 9009 ("the Official Forms prescribed by the Judicial Conference of the United States shall be observed and used with alterations as may be appropriate."). Official Form B203 is to be used for disclosure of compensation of an attorney for a debtor. The Seventh Circuit has stressed that "all bankruptcy is practiced through Official Forms; and unlike normal federal civil practice, where the forms are illustrations, in bankruptcy they are mandatory." Fadayiro v. Ameriquest Mortg. Co., 371 F.3d 920, 922 (7th Cir. 2004).

Additionally, General Order No 11-2 of this court requires debtors' counsel to file a copy of their written fee agreement. Specifically, the General Order, as amended, requires that:

> every agreement between a debtor and an attorney for the debtor in a case under ANY CHAPTER of the Bankruptcy Code that pertains, directly or indirectly, to the compensation paid or given, or to be paid or given, to or for the benefit of the attorney must be in the form of a written document signed by the debtor and the attorney. Agreements subject to this rule include, but are not limited to, the Court-Approved Retention Agreement as posted on the court's website, other fee or expense agreements, wage assignments, and security agreements of all kinds. Each such agreement must be attached to the statement that must be filed under Fed. R. Bankr. P. 2016(b) in all bankruptcy cases. Any agreement entered into after the filing of the statement under Rule 2016(b) must be filed as a supplement to that statement within 14 days of the date the agreement is entered into.

Second Amended General Order No. 11-2 (Bankr. N.D. Ill. Sept. 21, 2011).

Thus, as the rules, code and underlying policy make clear, NW&A should have filed its disclosure of compensation using Form B203, disclosing the source of its compensation and

attaching a copy of the engagement letter, within 14 days of the petition.  If for some reason

NW&A was unable to do so within the 14 day period, the firm should have sought an extension.

The Debtor also should have filed the application to employ NW&A as counsel as soon as

possible after the petition date, complying fully with Rule 2014(b).

Attorney Wolf has over 39 years' experience with extensive and noteworthy experience

in the field of bankruptcy generally and representing debtors reorganizing under chapter 11 in

particular.    Therefore, he and his firm should have been aware fully of the disclosure

requirements and deadlines set by the Bankruptcy Code, Rules and Local Rules, and procedures

for compliance.  Yet, in this case, NW&A's application was not filed until over two months after

the petition was filed, over a month after the 341 Meeting of Creditors was held, and only after

the U.S. Trustee filed a motion to dismiss or convert the Debtor's case.  It took an additional

month for NW&A to disclose that the bulk of its retainer had been paid by Plote Construction,

Inc., an entity that the Debtor's records listed as being a creditor with a claim for over

$45,000,000, – a claim that is 500% larger than the next largest claim and significantly greater

than all other scheduled claims against the Debtor combined.  Finally, it took NW&A almost

four months to properly file a Form B203 disclosure of compensation – a document that was to

be filed within 14 days after the commencement of this case.

The only explanation that NW&A offers for this delay in filing is that NW&A is "a very

small law firm," which was "very busy" and that "this sort of fell between the cracks because of

our litigation activities and this and other case[s]." (Trial Tr. 31:22 – 32:4, Oct. 24, 2013.)  While

the firm might be relatively small, the application to employ lists seven attorneys and three

legal assistants who "will be primarily responsible for representing the Debtor[] in [this case]."

(Mot. to Employ NW&A, ECF No. 38, ¶16.)  As the Seventh Circuit has made clear, a simple allegation that an attorney is busy is not enough to demonstrate "excusable neglect" in order to qualify for retroactive approval of employment.   "'Counsel's schedule and defendant's responsibilities,' without further elaboration, are insufficient reasons to support the necessary determination that there was 'excusable neglect.' 'Excusable neglect' requires something more than a simple failure to meet the deadline due to a busy schedule." U.S. v. Cates, 716 F.3d 445, 448 (7th Cir. 2013) (quoting U.S. v. Dumas, 94 F.3d 286, 289 (7th Cir. 1996)).

On the other hand, the record does not suggest that NW&A's delays were intentional or consciously meant to hide information.  By now it appears that all required disclosures have been made, even if untimely.  While in the absence of a showing of excusable neglect it is appropriate to deny fees incurred before a proper application to employ is filed and requisite disclosures made, the court would normally not deny an application to employ on that basis alone.  Denial of a motion to employ is an extreme sanction on the attorney and deprives the debtor of his or her right to choose counsel of his or her choice.  Here the failure to disclose is particularly troublesome, indeed problematic, when combined with the potential or actual conflicts of interest.  As discussed in the next section, there are serious concerns that Attorney Wolf and NW&A appear to be subject and may continue to be subject to divided loyalties towards certain affiliated entities because of past or current representations and the sources of the firm's compensation.  When such potential conflicts of interest are combined with the serious delays in disclosing the connections between NW&A and those entities, denial of the application is necessary.

**B.  Disinterestedness**

A chapter 11 debtor in possession may only employ an attorney to represent or assist it in carrying out its duties under the Bankruptcy Code if the attorney does "not hold or represent an interest adverse to the estate" and is a "disinterested person[]." 11 U.S.C. § 327(a).  The mere fact that NW&A represented the Debtor pre-petition and the mere fact that NW&A may have represented one or more creditors of the Debtor by themselves do not disqualify NW&A unless the representation creates "an actual conflict of interest."  11 U.S.C. §§1107(b); 327(c).

A "disinterested person" for purposes of Section 327 means a person who:

(A)  is not a creditor, an equity security holder, or an insider;
(B)  is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
(C)  does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. §101(14).  The disinterestedness requirement "goes to the heart of the integrity of the administration of the bankruptcy estate" and "reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate." U.S. v. Gellene, 182 F.3d 578, 588 (7th Cir. 1999) (citing In re Crivello, 134 F.3d 831, 835 (7th Cir. 1998)).  The phrase "or for any other reason" found at the end of the definition for "disinterested person" is a "catch-all clause" that is "sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude

required by the Code.'" Id. at 835 (quoting In re BH & P Inc., 949 F.2d 1300, 1308 (3d Cir.

1991)).

The separate additional provision requires that the prospective attorney not "hold or

represent an interest adverse to the estate." This term has been defined as:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or
(2) to possess a predisposition under circumstances that render such a bias against the estate.

Crivello, 134 F.3d at 835-36 (quoting In re Roberts, 46 B.R. 815, 827 (Bankr.D.Utah 1985)).

Together, "the statutory requirements of disinterestedness and no interest adverse to the

estate serve the important policy of ensuring that all professionals appointed pursuant to

section 327(a) tender undivided loyalty and provide untainted advice and assistance in

furtherance of their fiduciary responsibilities." Id. at 836 (quotation marks omitted).

The U.S. Trustee and PNC object to the pending application based on identified

connections between NW&A and numerous direct or indirect affiliates of the Debtor who either

owe the Debtor money, are owed money by the Debtor or are jointly liable with the Debtor for

debts; connections they argue that preclude the requisite finding of disinterestedness and no

interest adverse to the estate.

i.     **Potential Conflict in Connection with the PNC Litigation**

Most disconcerting is NW&A's connection with and representation of the Plotes and

their living trusts in connection with the PNC Litigation. Pre-petition and for at least a month

post-petition, NW&A represented Raymond Plote and Janice Plote in connection with the $8-9

million debt owed to PNC for which the Plotes were jointly liable.   As part of that

representation Neal Wolf initially was the attorney of record who filed an answer on their behalf. The Debtor's records show that on or about the petition date, the Plotes owed the Debtor almost $3 million. Rather than attempt to collect that debt, NW&A filed an adversary to enjoin PNC from seeking to enforce the debt against the Plotes, and without immediately disclosing to this court the prior representation.

The adversary complaint filed against PNC alleges that the Plotes and certain affiliates owned by the Plotes had contributed time, money, property and financial resources to the Debtor and that they would pledge an additional $5.3 million in unencumbered real estate as "credit support" for the Debtor's chapter 11 Plan, but only if the PNC Litigation is stayed. This suggested outcome is far from certain, however; indeed the circumstances strongly suggest that the adversary complaint may provide much more immediate benefit to the Plotes than the Debtor. Certainly its immediate effect will be to cease the litigation against the guarantors. The litigation may well benefit the estate if PNC is able to collect its debt from the Plotes; in that case presumably PNC's claim against the Debtor would be reduced, which in turn may benefit other general unsecured creditors.

Nor is it clear that the guarantors' supposed role in the Debtor's Plan will generally benefit the Debtor's estate as opposed to the guarantors' own interests. As to their alleged promise to contribute $5.3 million in real estate, it is important to note that first, the Plan only proposes that the Plotes or affiliates will pledge this real estate as collateral, and not actually contribute it or permit it to be liquidated absent a default in the Plan. Second, the Plan proposes that this collateral will only be pledged for the benefit of PNC and then only to secure the Debtor's obligations under the PNC loan. Because the Plotes have guaranteed the PNC

debt, this discriminatory treatment also reveals the pledge to be more likely to be beneficial to the Plotes' personal interests than the interests of the Debtor and the estate in general.  It is important to remember that neither the proposed Plan nor the evidence the Debtor has submitted shows that this debtor has a viable operating business which it desires to reorganize or that the Debtor now intends to attempt to market and sell assets in an orderly fashion.

Thus, the Debtor's Plan and the evidence the Debtor has presented in support of the application do not suggest this to be a case of equity owners who are willing to contribute capital in the hope that ultimately the debtor will be able to pay its debts over time and still have value.[7]  Nor has the Debtor demonstrated little more than the hope that the Plotes or affiliates will continue making contributions to the Debtor if the Plotes later decide that the Debtor's reorganization is no longer in their personal best interest.

ii.    **Other Representation**

Mr. Wolf admits that he currently represents Metro Commons, LLC. (Trial Tr. 21:16-22, Oct. 24, 2013.)   The Debtor's records show that Metro Commons, LLC owes the Debtor $94,303.27. The evidence also showed that NW&A represented White Deer Run Golf Course, LLC as counsel of record in litigation for the first 3 months post-petition.  The Debtor's records show that White Deer Run Golf Course, LLC owes the Debtor $3,230,436.31.   Further, Mr. Wolf's testimony reveals that he still considers White Deer to be a client and that he continues to represent it, even if he is no longer its counsel of record in the BMO Harris litigation. (Trial Tr. 16:2-11, Oct. 24, 2013.)  Mr. Wolf also admits that he represented Boulder Ridge within the one

---

[7] Notably, at least with respect to the debt to PNC, the Plan proposes to make no payments of principal for 84 months, and to make interest payments at a rate considerably less than that specified in the promissory note attached to PNC's proof of claim.

year prior to the bankruptcy petition and in connection with a $1.3 to 1.4 million debt to BMO Harris Bank for which the Debtor is jointly liable. (Trial Tr. 17:18 – 19:2, Oct. 24, 2013.) The Debtor's records reveal that Boulder Ridge is a creditor with a claim of $144,478.70 against the Debtor.

If the Debtor's records are correct, then NW&A has represented several entities, some of whom it still represents, that are either creditors of the Debtor or hold interests that are potentially adverse to the Debtor. Mr. Wolf's contention that these are not true debts or assets of the Debtor merely highlights the issue, at least for purposes of the pending application. Already concluding that an entity does not truly owe the Debtor money suggests that as NW&A enters the case it is unwilling to recommend that the Debtor seek to collect the debt and will not take action if the creditor seeks to collect the receivable on its own behalf. The fact that NW&A previously or currently represents some of these affiliates tends to render any such conclusion suspect.[8]

In any event the issue is less whether or not such liabilities and assets truly are assets and liabilities of the Debtor than the very real concern that NW&A's judgment regarding such potential claims has been clouded by the attorneys' prior representation of the affiliates. NW&A argues that, if the Debtor were to later decide to try to enforce any of those receivables against entities it had previously represented, it can obtain conflicts counsel. But the point

---

[8] Nor, contrary to NW&A's arguments, is it clear that his conclusions about these debts are a clear and obvious conclusion. The testimony shows that there was no written agreement to corroborate Mr. Wolf's description of the Debtor as a mere conduit, nor was there evidence that any specific account or note receivable was traceable to any specific account or note payable. Very little evidence, other than Attorney Wolf's representations and the vague and generalized testimony of an accountant were presented to support the argument that the listed debts and assets were not those of the Debtor. It is also inconsistent with such argument that the Debtor scheduled the $4.5 net liability listed in the books and records as a debt to affiliates in its bankruptcy schedules or that Plote Construction Inc. filed a proof of claim against the Debtor for $42,769,838.78.

remains that if NWA's judgment may be conflicted by these competing interests it may never advise the Debtor to attempt to enforce receivables or object to claims.

### iii. Source of Retainer

The U.S. Trustee similarly raises concern about $110,000 in retainers paid to NW&A by Plote Construction Inc., who then filed a proof of claim against the Debtor for $42,769,383.78. This was not initially disclosed or disclosed for months after the petition was filed. Attorney Wolf suggested that he was initially unaware of the source of the compensation, stating that he "[f]rankly … didn't pay any attention to it." (Trial Tr. 123:5, Oct. 24, 2013.) It was unclear from the testimony exactly when he learned that the two payments had been through wire transfers from Plote Construction Inc., though Mr. Wolf testified that he did not know who funded the retainers when he filed his original declaration. (Trial Tr. 30:10-12, Oct. 24, 2013.)

But it is not clear whether NW&A actually had no idea about the original source of the funds used to pay the retainers or if it had simply concluded that the original source was not relevant because it ostensibly was paid 'on behalf of' the Debtor. Mr. Wolf testified that Plote Construction had "advanced" the funds "on behalf of" the Debtor and that the Debtor had booked the payment as an "account payable to Plote Construction, Inc." (Trial Tr. 30:5-9, Oct. 24, 2013.) But Section 329(a) requires disclosure of "the source of such compensation." It is no defense to argue that the payment was "on behalf of the debtor" since that will invariably be the case where the payment is by a third party. Additionally, in this case NW&A helped the Debtor prepare schedules and a statement of financial affairs. It is difficult to understand how NW&A could not have realized the source of the retainer after conducting the type of diligence required to help prepare those schedules.

In any event, NW&A now is well aware that the source of its retainer is Plote Construction, Inc. Mr. Wolf testified that there was no express agreement between NW&A and Plote Construction for Plote Construction to pay future legal fees to NW&A. (Trial Tr. 30:20 – 31:4, Oct. 24, 2013.)   From the Debtor's own submissions it is obvious that the only likely source of fees, at least for the near future, will be from Plote Construction or another operating affiliate.  Attorney Wolf essentially admitted as much when he stated in closing argument that "Ray Plote and his wife and their affiliated companies literally put the money into [the Debtor] to service the debt … and that is how the plan would work." (Trial Tr. 136:13-17, Oct. 24, 2013.) The evidence shows that the Debtor has essentially no ongoing operations and virtually no income other than that contributed by affiliates, that almost all of its cash is collateral securing debts to First Midwest Bank (Schedules B, D, ECF No. 18), and that the Debtor has made no effort and presently does not intend to liquidate its other assets or to find DIP financing from a non-affiliate.

The court does not mean to imply that there is a *per se* rule against an affiliate paying or guaranteeing payment of legal fees to counsel for a chapter 11 debtor in possession.  The problem here is that NW&A on a number of occasions already has drawn conclusions in favor of those affiliates on issues that potentially pitted the Debtor's interest and the interest of the Debtor's estate against the interest of affiliates who NW&A either previously represented or who was or is a potential source of funds to pay NW&A's fees.  These include:

- that what looks like $54 million in assets and $58 million in liabilities owed to or from certain affiliates are not actual assets or liabilities of the Debtor and that the Debtor should not attempt to collect those amounts booked as receivables;

- that ceasing PNC's litigation to enforce the guarantees of certain of the Debtor's debts by the Plotes and their living trusts is in the best interest of the Debtor and the Debtor's estate;

- that it is not in the best interest of the Debtor or the Debtor's estate to attempt to liquidate its real property and other assets;

- that transfers to certain affiliates within 1 year before the petition and in excess of $1 million are not potentially avoidable; and

- that it is acceptable to propose paying interest-only payments for 84 months to PNC and other large third party secured and unsecured creditors while apparently paying debts to affiliates in full.

None of these conclusions are necessarily wrong, but given the connections between NW&A and the affiliates described above, they are not free from the appearance that NW&A's professional judgment may be clouded by conflicting interests.

This concern is heightened here by the long, unsatisfactorily explained delays and initial failings to disclose information highly relevant to evaluate the potential for conflict. With such information, the parties and the court could have quickly determined whether the conclusions being drawn by NW&A are well-supported. Contrary to NW&A's assertions, that has not necessarily been the case here. For example, NW&A's argument that the Debtor had acted as a mere conduit in its capacity as cash management system to facilitate intercompany loans between separate affiliated entities is not clearly supported by the evidence presented at trial. Instead, the testimony revealed that there were no written agreements as to the ownership or management of various funds involving the Debtor's involvement in the as cash management

system (Trial Tr. 80:19 – 81:3, Oct. 24, 2013), that when cash was disbursed by the Debtor in its capacity as a cash management system on behalf of another entity the companies did not keep track of which entity had deposited the original funds used to make the disbursement (Trial Tr. 75:1-5, Oct. 24, 2013), and that funds transferred into the Debtor's account in its capacity as cash management system were regularly co-mingled with other funds (Trial Tr. 73:20-23, Oct. 24, 2013).  Rather than serving as a passive conduit or a centralized checking account for the convenience of parties in a joint venture, the Debtor's accountant who had set up the cash management system described the Debtor's system as "designed <u>to give control</u> to an entity that <u>will control</u> any surplus funds from companies, pay bills, anything of that nature.  Basically <u>control</u> all cash. And its intent is when you have a large conglomerate organization <u>to control – easily control</u> the intercompany balances that exist or may exist from the development of surplus cash that may come from certain entities and <u>to loan</u> funds to other entities that may need cash." (Trial Tr. 40:22 – 41:4, Oct. 24, 2013) (emphasis added).

NW&A suggests that if the Debtor at some point decides to sue the Plotes or their affiliates, NW&A could then hire conflicts counsel. (Trial Tr. 135:18-24, Oct. 24, 2013.)  But the issue is not just about avoiding conflicts of interest when the Debtor seeks to object to a claim of an affiliate or to enforce a debt owed by and affiliate.  Rather, it is whether NW&A is giving disinterested advice to the Debtor when it advises the Debtor <u>not</u> to object or to seek to enforce the debt.  Indeed, virtually every effort expended by the parties of interest in this case has been spent addressing NW&A's potential conflicts of interest and failure to disclose.  Given the history of NW&A's relationship with these affiliates and the history within this case – including the failures of disclosure – compliance with Section 327 and Rule 2014 and the

underlying policies for these provisions requires the Debtor to seek new, disinterested counsel without such history.


### IV.    CONCLUSION

For the forgoing reasons, the application to employ NW&A will be denied.  A separate order will be entered consistent with this Memorandum Opinion.


DATE:  March 17, 2014                    ENTER:


                                                        _____

                                                        Thomas M. Lynch
                                                        United States Bankruptcy Judge